Filed 2/15/22  Marriage of Valkova CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of VLADO VALKOV and ANA VALKOVA. | B304187 |
| VLADO VALKOV,<br><br>    Appellant,<br><br>    v.<br><br>ANA VALKOVA,<br><br>    Respondent. | Los Angeles County<br>Super. Ct. No. BD643724 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joshua D. Wayser and Timothy M. Weiner, Judges. Affirmed.

John L. Dodd & Associates and John L. Dodd for Appellant.

Kearney Baker and Gary W. Kearney for Respondent.

# INTRODUCTION

Vlado Valkov[1] appeals from the final judgment in this heavily litigated marital dissolution action. Vlado challenges the trial court's denials of his repeated requests for a trial continuance, the court's refusal to enforce a stipulated settlement between him and his former wife, Ana Valkova, and the court's imposition of approximately $85,000 in monetary sanctions against him under Family Code[2] section 271 due to his conduct during the litigation.

We conclude that the court did not abuse its discretion in denying Vlado's requests for a trial continuance because Vlado failed to demonstrate good cause for a continuance. Specifically, when Vlado asked to continue the trial in order to reopen discovery, he did not explain why the materials he sought to discover were unavailable prior to the discovery cut-off date. And when Vlado repeatedly requested to continue the trial due to mental health concerns, he failed to provide any medical evidence supporting his contention that he was unable to attend the trial. Regarding the stipulated settlement, the court reasonably exercised its equitable authority to set that agreement aside, particularly in light of the extremely inequitable terms of the agreement and Vlado's aggressive conduct throughout the litigation. Finally, the record amply supports the court's imposition of sanctions under section 271. Accordingly, we affirm.

---

[1] As is typical in marital dissolution cases, we refer to the parties by their first names. No disrespect is intended.

[2] All undesignated statutory references are to the Family Code.

2

# FACTS AND PROCEDURAL BACKGROUND

## 1.    Background

Vlado and Ana married in May 1998 and have two minor children. Vlado is an architect and Ana worked in Vlado's business during the marriage. The parties separated on July 16, 2016.

## 2.    Criminal Complaint

In December 2015, Vlado contacted the Culver City Police Department and reported that Ana had written checks from a business checking account and forged his signature without his knowledge or consent. Vlado said he had been out of the country in early December and while he was away Ana had forged seven checks. He reported additional fraudulent checks in March 2016. Vlado also contacted US Bank and submitted a fraud claim in the amount of $10,872.85, which US Bank approved. Subsequently, criminal charges were brought against Ana.

Ana did not learn about the criminal investigation until July 4, 2016.

## 3.    Restraining Order and Petition for Dissolution

On July 20, 2016, Ana filed and was granted a temporary restraining order against Vlado based on a history of domestic violence.[3] One week later, Vlado initiated these marital dissolution proceedings.

---

[3] In March 2017, the court granted Ana's request for a five-year domestic violence restraining order.

### 4. Stipulated Property Division

In April 2017, Vlado and Ana agreed to sell the family residence (the condo) to Sol Levitt, a business acquaintance of Vlado's. Two documents were executed in furtherance of the sale: an agreement regarding the sale signed by Vlado, Ana, and Levitt (agreement to sell) and a stipulation regarding the couple's property division (stipulated property division).

The stipulated property division required Ana to transfer her community property interest in the condo to Vlado and required Vlado to assume the encumbrances on the condo, including the mortgage, property taxes, and homeowners' association dues. Ana also agreed that Vlado would receive all the proceeds of the condo sale, a property in Bulgaria purchased by the couple during the marriage which was worth approximately $50,000, a vehicle worth approximately $23,000, a 22 percent interest in a property in Beverly Hills with a total value of approximately $285,000, Vlado's business and all business assets (including bank accounts[4] and accounts receivable), credit card debt of $60,000, and a debt to Vlado's parents of approximately $75,000. For her part, Ana would receive a vehicle worth approximately $6,000, bank accounts containing less than $50, a debt to the IRS of $1,931, credit card debt of approximately $51,000, and unsecured loans of roughly $40,000. As compensation for the unequal division of community property, Ana would receive an "equalization payment" of

---

[4] These accounts contained more than $44,000 at the time judgment was entered.

4

$42,000 and Vlado would sign a civil compromise related to the bank fraud case instigated against Ana by Vlado.[5]

The agreement to sell provided that Vlado would sell the condo to Levitt for the below-market price of $420,000, minus the encumbrances of approximately $130,000 (the mortgage, delinquent property taxes, and delinquent homeowners' association fees). From the roughly $290,000 net proceeds of the sale, Levitt would pay Ana $42,000 in three installments.[6] These payments represented an "equalization payment" due to Ana from Vlado. The remaining proceeds of the sale—approximately $250,000—would be paid to Vlado.

As required under the stipulated property division, Ana signed a quitclaim deed transferring her interest in the condo to Vlado in June 2017. And pursuant to the agreement to sell, Levitt made two of the three required payments to Ana. But Vlado refused to sell the condo to Levitt for the agreed-upon price.

## 5. Draft Settlement Agreements

In June 2017, while they were contemplating the sale of the condo, Vlado and Ana attempted to settle the dissolution action. Specifically, on June 23, 2017, a Friday afternoon, Ana's attorney

---

[5] As explained *post*, the parties executed the stipulated property division but did not have their signatures notarized as required by the stipulation. The parties then agreed notarization would not be required. Ana's counsel circulated a modified version containing handwritten interlineations with blanks for the parties to initial their agreement. Ana initialed the modified stipulation. Vlado did not.

[6] Ana needed the cash to pay the attorney who was defending her in the criminal action and to make restitution to US Bank.

emailed Ana and Vlado a draft marital settlement agreement (Ana's proposed MSA) incorporating the terms of the stipulated property division. Within one hour, Ana signed the agreement and returned her copy to her counsel.

Vlado did not sign Ana's proposed MSA. Instead, during the weekend of June 24 and 25, 2017, Vlado worked with Levitt to draft an alternative marital settlement agreement (Vlado's proposed MSA) that contained several terms that were materially different than Ana's proposed MSA. Late in the evening of June 25, 2017, Levitt emailed Ana's counsel Vlado's proposed MSA with a cover note stating that Ana's proposed MSA " 'gets us close but as written is not acceptable.' " Vlado signed Vlado's proposed MSA in the early morning hours of June 26, 2017. Ana did not sign Vlado's proposed MSA.

**6.     First Bifurcated Trial and Stipulation**

As noted, Vlado refused to sell the condo to Levitt for the agreed-upon price. To resolve the issue, Ana filed a complaint for joinder in October 2017 seeking to join Levitt to the dissolution action and asking the court to determine the parties' interests in the residence. The court granted the joinder request pursuant to stipulation of the parties. The court ordered a bifurcated trial in early February 2018 regarding the sale of the condo and allocation of related debts and the proceeds. Vlado filed a cross-complaint against Levitt alleging Levitt was his attorney and asserting a claim for breach of fiduciary duty against him.

The first bifurcated trial commenced on February 5, 2018, and resulted in a stipulation by Vlado, Ana, and Levitt concerning the conditions of sale of the condo. The property was later sold for $560,000. The net proceeds of the sale ($286,222) were held in a trust account by Ana's counsel.

## 7. Vlado's Request for Entry of Judgment Regarding Proposed MSA

The matter was initially set for trial in October 2018. The court ordered all discovery to be propounded by July 10, 2018, and to be completed by August 30, 2018. The court also indicated that if Vlado wanted to file a motion for entry of judgment under Code of Civil Procedure section 664.6, he should do so no later than July 10, 2018.

In July 2018, Vlado requested entry of judgment pursuant to Code of Civil Procedure section 664.6. Specifically, Vlado asked the court for "entry of a Judgment covering child custody and the division of debts and assets executed on June 23 and 24, 2017, by each party." Vlado represented that he had fully complied with Ana's proposed MSA but denied that Ana had executed a quitclaim deed transferring her interest in the condo to him. He attached a copy of Ana's proposed MSA bearing his signature with the handwritten date of June 24, 2017.

Ana opposed the request and advised the court that the parties had not settled the case and that the document filed by Vlado was inaccurate. Ana requested that the court address the issues at trial.

## 8. Stipulated Property Division Signed by the Court

In late August 2018, Vlado submitted to the court a copy of the stipulated property division bearing both his and Ana's signatures. In addition, the copy filed with the court included two interlineations eliminating the requirement that signatures be notarized. Both interlineations were purportedly initialed by Vlado and Ana. The court immediately signed and filed the stipulated property division (property division order).

7

Also during that month, Ana filed a request for order seeking to compel discovery and requesting evidentiary sanctions as well as monetary sanctions in the amount of $4,372.50 relating, in part, to Vlado's failure to appear at his noticed deposition. The matter was subsequently continued for hearing at trial.

## 9. Second Bifurcated Trial Regarding Proposed MSA

In November 2018, the court conducted a three-day trial regarding Vlado's request to enter judgment on Ana's proposed MSA. A major issue to be resolved at trial was whether Vlado signed Ana's proposed MSA on June 24, 2017, as Vlado represented to the court. Vlado apparently[7] testified that he did so and claimed Ana's proposed MSA was binding and enforceable. Vlado explained that he worked with Levitt over the weekend of June 24 and 25, 2017 to prepare a "supplemental agreement" rather than a counterproposal to Ana's proposed MSA. Ana and Levitt also testified.

The court concluded, based on the credibility of the witnesses and the documentary evidence, that Vlado did not sign Ana's proposed MSA on June 24, 2017, as he claimed. Instead, the court found Vlado backdated his signature at some later time and therefore the parties had not mutually agreed to the terms of Ana's proposed MSA in June 2017. Accordingly, and after taking the matter under submission, the court issued a written order on November 28, 2018, denying Vlado's request to enter judgment predicated on Ana's proposed MSA. The court did not address

---

[7] The appellate record does not include a reporter's transcript of those proceedings.

8

issues raised by Ana concerning the enforceability of the stipulated property division.

**10.    Ana's Request to Set Aside the Stipulated Property Division and Order, Request for Sanctions Under Section 271**

In February 2019, Ana filed a request for order seeking to set aside the property division order and rescind the stipulated property division. She also requested sanctions against Vlado under section 271. Ana submitted several versions of the stipulated property division bearing the parties' signatures and initials. Those documents indicated that Vlado did not fully execute the stipulated property division in 2017.[8] Ana asserted that, as with her proposed MSA, the parties had not contemporaneously agreed to and executed the stipulated property division.

Ana argued, among other things, that equitable principles authorized the court to set aside the property division order and rescind the stipulated property division. Specifically, Ana argued she had signed the stipulated property division under extreme duress stemming from the abusive marital relationship, lack of financial support from Vlado prior to and during their separation, mounting bills, and the criminal prosecution instigated by Vlado. Documents submitted with the request for order indicated that Ana signed the stipulated property division, in which Vlado

---

[8] As noted, both Vlado and Ana signed the stipulated property division in April 2017. However, Vlado did not initial the handwritten changes made by counsel that eliminated the notarization requirement at that time.

promised to execute a civil compromise concerning his fraud claims, one day before the scheduled pretrial hearing in the criminal matter.

Regarding her request for sanctions, Ana noted that she had incurred over $100,000 in attorney's fees in the marital dissolution action, much of which was necessitated by Vlado's obstruction and aggressive litigation tactics. She argued Vlado repeatedly delayed the case, refused to comply with discovery requests and court orders, failed to appear at his deposition, and unreasonably refused to sell the condo which required Ana to litigate that issue. She also incurred substantial fees in defending against Vlado's bad faith request for entry of judgment predicated on a forged version of Ana's proposed MSA. Ana's request for order was continued for hearing at trial on July 25, 2019.

**11. Vlado Seeks Further Discovery**

On June 3, 2019, Vlado obtained and served a subpoena on US Bank seeking records relating to an account in Ana's name for the period 2014 to the present. Ana filed a motion to quash the subpoena and requested sanctions against Vlado, arguing that the motion failed to provide proper notice and was filed almost one year after the discovery cut-off date.[9]

On June 24, 2019, Vlado obtained and served a subpoena on Union Bank seeking records relating to an account in Ana's name for the period September 1, 2001 to the present.

---

[9] In August 2019, Vlado withdrew the subpoena and asked the court to deny Ana's request for sanctions. The court granted Ana's motion to quash and awarded sanctions in the amount of $3,240.

10

## 12.  Vlado's Requests for Trial Continuance

### 12.1.  Additional Discovery

On June 28, 2019, Vlado submitted an ex parte application seeking to reopen discovery and extend the cut-off date to July 30, 2019 and to continue the trial date from July 25, 2019 to August 30, 2019. In his supporting declaration, and in his sworn statements to the court, Vlado represented that he had recently discovered "new and disturbing" facts and information that were "critically important for that case."

The court denied the request without prejudice on the ground that Vlado failed to demonstrate good cause for the continuance. Vlado became upset in the courtroom and the following exchange occurred:

"Vlado:       Your honor, it has been continued twice because of the respondent. This is the first time I'm asking for continuance just to review crimes.

"Ana's counsel: That's not true, Your Honor.

"Vlado:       Those are the facts.

"Court:       All right. Thank you.

"Vlado:       Why would you do that to me?

"Court:       I'm not continuing it. Thank you.

"Vlado:       Why – Why are you – Why are you –

"Court:       Sir –

"Vlado:       Why are you – why are you supporting criminal?

"Bailiff:      Sir, stop. Stop.

"Vlado:       Why are you supporting criminal? I cannot stand the injustice any more.

"Bailiff:      Just relax.

"Vlado:      I cannot have the right to – I cannot have the right to say something, sir?

"Bailiff:      Relax. I want you to sit down. Sit down."

The transcript of the proceeding concludes at that point. Following the termination of the recorded proceeding, however, Vlado used a razor blade to cut his own wrist horizontally three times while still in the courtroom. Vlado was restrained by several bailiffs and later taken to a hospital.[10] He was released in less than 24 hours.

## 12.2.  Mental Health

On July 24, 2019, one day before the third bifurcated trial was set to begin, Vlado filed an ex parte request for a continuance due to "temporary mental incapacity." In connection with the ex parte request, Vlado was represented for the first time by new, recently retained counsel. Counsel represented that Vlado's "mental state [has] inhibited his ability to assist [counsel] in preparing for [t]his matter and actively participating in preparing for trial. [Vlado] is currently receiving a treatment at the American Indian Counseling Center according to [a representative] of the Department of Mental Health. The trial date is currently July 25, 2019. With the current trial date, [Vlado] does not have time to sufficiently recover from his treatment to assist counsel in the preparation for his trial." Counsel represented that he had been retained by Vlado on

---

[10] On July 2, 2019, citing Vlado's attempt to harm himself in court, Ana filed an emergency request for sole legal and physical custody of the children with no visitation for Vlado. The court granted the request pending a further hearing.

July 16, 2019, and had only met with Vlado once. The ex parte application attached a letter from the County of Los Angeles Department of Mental Health dated July 17, 2019, stating that Vlado had been attending outpatient psychotherapy on a weekly basis since February 2019, and had made "minimal progress." The letter was not written by a treating physician.

Ana opposed the request for a continuance on several grounds. First, Ana noted that the letter submitted in support of the request for a continuance was not signed by a physician nor did it suggest that Vlado was incapacitated, hospitalized, or otherwise unavailable to attend the trial. Second, although Vlado's attempt to harm himself in court was troubling, Vlado was not held on an involuntary inpatient basis after that incident nor was he taking any medication to treat any mental health condition. Ana also documented Vlado's prior attempts to delay the trial as well as his recent attempt to reopen discovery and further delay the trial. Finally, Ana noted that Vlado's current counsel was Vlado's *twelfth* attorney of record[11] in the dissolution matter.

The court (Judge Lewis) denied the ex parte request. The following day, on the morning trial was to begin, Vlado's counsel renewed the request for a continuance on the ground that the court had not properly considered the request on the merits. Due to an illness, Judge Lewis was unavailable and the request for reconsideration was heard by a different judge. After reviewing

---

[11] One of Vlado's prior attorneys was relieved as counsel by the court after Vlado threatened to hurt the attorney's family. Another attorney advised Ana's counsel that he no longer wished to represent Vlado due to Vlado's " 'inability to control his anger and lash out to others [*sic*].' "

the court file, the court denied Vlado's motion to reconsider the request for continuance and the matter proceeded to a different courtroom for trial.

## 13. Third Bifurcated Trial on Remaining Issues

### 13.1. Proceedings

A short cause trial took place over two days in July 2019 and an additional day in September 2019 before Judge Wayser. Ana, her counsel, and Levitt appeared, as did Vlado's counsel of record. Vlado, however, did not attend the trial.

At the outset of the trial, Vlado's counsel renewed the request to continue the trial based on Vlado's purported unavailability due to mental health concerns. The court denied the renewed request.

With the agreement of counsel, the court agreed to consider as evidence prior declarations submitted by the parties. As a result, the majority of the testimony and evidence presented at trial related to Levitt's claim for lost profit on the purchase and sale of the condo and Vlado's cross-complaint against Levitt concerning a purported attorney-client relationship between Levitt and Vlado. That testimony is not relevant to this appeal. In addition, Ana testified about financial transactions relating to the sale of the condo, payoff of the debts relating to the condo, and other assets and debts owned by the community. The court then requested briefing from the parties on the remaining issues.

On the final day of trial, September 6, 2019, Ana provided additional testimony regarding community property assets and debts. And counsel argued whether the stipulated property division and related order should be set aside based on undue influence.

### 13.2. Findings

After considering the testimony, documentary evidence, oral and written arguments, and the credibility of the witnesses, the court issued its ruling on October 7, 2019. After summarizing the history of the case, the court commented, "One consistent theme emerges from the above description of the proceedings: Vlado has misused the Court process to further his agenda with respect to Ana. [¶] Vlado has gone through 12 family law lawyers in this case, which is a clear and obvious sign that something is amiss. Parties, of course, have the right to counsel of their choosing. But at a certain point, reason and reality must come into play. Going through that many lawyers can be caused by any combination of several factors, but none of those factors would likely comply with the spirit of FC 271." Concerning the trial testimony, the court found that Levitt and Ana were credible and presented a cogent and comprehensive account of the relevant facts.

The court specifically found that Vlado had misused the criminal court process to exert pressure on Ana in an attempt to leverage an inequitable property settlement from her. Accordingly, the court chose not to enforce the stipulated property division and instead would distribute the community property equally. The court also granted Ana's request for sanctions under section 271, commenting: "This case sadly is the very reason why FC 271 must exist as an effective tool for trial court judges. A five-year ROAH is issued; claims of financial abuse are then brought by the offending spouse against the victim of DV; the abusing spouse attempts to use undue advantage to leverage an unequal distribution of the community [property], and then the abusing spouse prolongs the proceedings

15

and continues with inappropriate behavior in and out of court. FC 271 was designed just for this type of situation … ."

## 14. Final Judgment and Appeal

The court (Judge Weiner) entered a final judgment on January 21, 2020.

### 14.1. Property Division

As pertinent here, the court awarded Vlado the following significant items of community property, including any encumbrances:

- ◦ Proceeds from the sale of the condo of $137,090;
- ◦ Real property in Bulgaria valued at $50,020;
- ◦ An automobile valued at $23,346;
- ◦ An investment interest in a property in Beverly Hills valued at $66,708;
- ◦ Vlado's business, DBA Design Initiatives; and
- ◦ A business bank account containing $44,357.

The court also confirmed as Vlado's separate property, including any encumbrances:

- ◦ Real property in Bulgaria valued at $44,494; and
- ◦ Proceeds from the prior sale of property in Bulgaria of $49,907.

The court awarded Ana the following significant items of community property, including any encumbrances:

- ◦ Proceeds from the sale of the condo of $149,132; and

16

◦ An automobile valued at $5,965.

The court also confirmed as Ana's separate property debts in the amount of $93,950.

Due to the unequal distribution of assets and debts, Vlado owed Ana $135,920 as an equalization payment.

### 14.2. Sanctions

The judgment also included an award of sanctions against Vlado under section 271 in the amount of $85,739.25, comprising $3,240 (of which $882 had been paid) relating to Ana's motion to quash the subpoena issued to US Bank, $4,372.50 relating to Ana's motion to compel discovery responses, and $79,008.75 relating to the proceedings to set aside the stipulated property division and subsequent court order.

### 14.3. Distribution of Community Funds

At the time judgment was entered, the proceeds from the sale of the condo, held by Ana's attorney in a trust account, totaled $286,222. The court ordered the entire amount to be paid to Ana and ordered Vlado to pay the remaining balance owed to Ana, $85,739.25, immediately upon entry of the judgment.

The court entered the judgment on January 21, 2020, and served notice of entry of judgment that day. Vlado timely appeals.

## DISCUSSION

Vlado argues the court erred in denying his requests for a trial continuance, setting aside the stipulated property division and related court order, and imposing sanctions against him under section 271. We address these issues in turn.

17

1. **The court did not abuse its discretion in denying Vlado's repeated requests for a trial continuance.**

    1.1. **Legal Principles and Standard of Review**

    California Rules of Court, rule 3.1332 (Rule 3.1332), governs motions for continuance of a trial. As its starting point, the rule states: "To ensure the prompt disposition of civil cases, the dates assigned for a trial are firm. All parties and their counsel must regard the date set for trial as certain." (Rule 3.1332(a).) Trial continuances are "disfavored," and "[t]he court may grant a continuance only on an affirmative showing of good cause requiring the continuance." (Rule 3.1332(c).) As pertinent here, good cause for a continuance may exist due to "[a] party's excused inability to obtain essential testimony, documents, or other material evidence despite diligent efforts" or where a party is unavailable "because of death, illness, or other excusable circumstances." (Rule 3.1332(c)(2), (6).) Assuming good cause is shown, the court must also consider all relevant facts and circumstances surrounding the request for a continuance including, for example, "[t]he proximity of the trial date," "[w]hether there was any previous continuance, extension of time, or delay of trial due to any party," "[t]he length of the continuance requested," "[t]he prejudice that parties or witnesses will suffer as a result of the continuance," and "[w]hether the interests of justice are best served by a continuance, by the trial of the matter, or by imposing conditions on the continuance." (Rule 3.1332(d)(1)–(3), (5), (10).)

    We review the denial of a motion to continue the trial date for an abuse of discretion. (*Schlothan v. Rusalem* (1953) 41 Cal.2d 414, 417; *Qaadir v. Figueroa* (2021) 67 Cal.App.5th 790, 814.) " '[T]he appropriate test of abuse of discretion is whether or not

the trial court exceeded the bounds of reason, all of the circumstances before it being considered.' " (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197.) " 'The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) " ' "The abuse of discretion standard … measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria." ' [Citation.] As long as there is a reasonable or even fairly debatable justification for the ruling, we will not set it aside." (*Hahn v. Diaz-Barba* (2011) 194 Cal.App.4th 1177, 1195.)

### 1.2. Vlado failed to demonstrate good cause to continue the trial to conduct additional discovery.

As noted, approximately one month before trial was set to begin, Vlado requested to continue the trial from July 25, 2019 to August 30, 2019. He also asked the court to reopen discovery and set a new discovery cut-off date of July 30, 2019. The court denied the request without prejudice on the ground that Vlado failed to demonstrate good cause for the continuance. Vlado contends the court abused its discretion by denying his request.

As pertinent here, good cause for a continuance may exist due to "[a] party's excused inability to obtain essential testimony, documents, or other material evidence despite diligent efforts." (Rule 3.1332(c)(6).) Vlado failed to establish any "excused inability" to obtain the evidence "despite diligent efforts." Vlado's one-page declaration states broadly that he "recently discovered a

19

new disturbing information which is critically important for that case and we want to know the truth! 1) The respondent [Ana] broke her fiduciary duty by opening secret accounts and embezzling family funds using a fraudulent scheme. 2) The respondent [Ana] hid those accounts and did not disclose them. It is a 3 years case—1 month continuance should not be a problem. But will help us learn the truth. Why the respondent is so afraid of discovering the truth and is opposing the justice?" (*Sic*.) Vlado makes no mention, however, of his prior discovery efforts or any specific action taken by Ana to conceal information from him. His statements in court shed no light on that issue.

It appears that Vlado hoped to obtain bank records from two banks—US Bank and Union Bank—regarding accounts he suspected were held by Ana at those institutions. Regarding Union Bank, Vlado averred that "[i]n June 2019 the petitioner [Vlado] received by mail an ad revealing that the respondent [Ana] is having undisclosed bank account. There is underlying assumption/reasonable suspicion that the Respondent failed to hasn't disclosed (at discovery completed on 08/30/18) 2 bank accounts and the court needs to issue a new discovery and continuation of July 25-26 trial." (*Sic*.) The declaration attachments included an image of a postcard from Union Bank addressed to "Ana Valkova or Current Occupant" inviting the recipient to "[o]pen a new business checking account and receive a $350 Bonus." On its face, the advertisement does not suggest that Ana already had an account at Union Bank nor does it support a reasonable inference that she did, particularly given that the invitation to open an account was addressed to Ana *or a current occupant*.

As to US Bank, Vlado attached copies of bank statements addressed to "Ana V Valkova dba Design Initiatives" at the condo address. The statements include handwritten[12] notations such as "There is no 'Ana V Valkova dba Design Initiatives' registered! There is only 'Vlado Valkov dba Design Initiatives'! Mrs. Valkova fraudulently opened 'Ana V Valkova dba Design Initiatives['] bank account and stole $22,500 from my dba!" The two legible statements from US Bank were dated May and August 2014, well before the dissolution proceedings began and well before discovery was concluded. But in his declaration, Vlado did not explain why he was unable to obtain statements from US Bank before the discovery cut-off date. In other words, he provided no evidence of prior diligent efforts to obtain these bank records and therefore failed to establish good cause to continue the trial and conduct additional discovery.

Vlado does not address this issue in his appellate briefs, except to say that "[g]iven Ana's financial offenses at the outset of this case, the trial court abused its discretion in denying a reasonable continuance so that Vlado could obtain and analyze all claims, accounts[,] and assets." For the record, however, the court never made any factual findings relating to Ana's alleged criminal conduct and observed that, "given Vlado's other conduct, it appears unlikely" that Vlado's accusations of fraud were truthful.

---

[12] The handwriting appears similar, if not identical, to Vlado's handwritten declaration.

In short, Vlado failed to demonstrate good cause for a trial continuance in order to conduct additional discovery. Accordingly, the court did not abuse its discretion in denying his request.

### 1.3. Vlado failed to demonstrate good cause to continue the trial based on an illness or other medical condition.

Vlado also made repeated requests to continue the trial due to his mental state. As noted, one day before the third bifurcated trial was set to begin, Vlado filed an ex parte request for a continuance due to "temporary mental incapacity." That request and several requests for reconsideration were denied by three different judges because Vlado failed to proffer any evidence that he was unable to attend the trial.

As we have said, a court may find good cause to continue a trial due to "[t]he unavailability of a party because of death, illness, or other excusable circumstances." (Rule 3.1332(c)(2).) The Rules of Court do not define "unavailability" and the parties have not attempted to do so. But we conclude that, under any reasonable standard, Vlado failed to establish that he was unavailable to attend the trial. The only evidence Vlado provided in support of his ex parte application was a letter from the County of Los Angeles Department of Mental Health dated July 17, 2019, stating that Vlado had been attending outpatient psychotherapy on a weekly basis since February 2019, and had made "minimal progress." The letter was not written by a treating physician and does not suggest that Vlado was unable to attend or participate in the trial. Vlado did not appear at the ex parte hearing, nor did he submit a declaration supporting the request for a continuance.

Ana submitted evidence demonstrating that Vlado was not incapacitated. Specifically, with Vlado's consent, Ana's counsel contacted the author of the letter. Counsel stated in her responsive declaration that after the in-court incident, Vlado was not placed on an involuntary psychiatric hold and was instead released to a friend after less than 24 hours. Further, according to the letter's author, Vlado was not a danger to himself, he had not threatened to hurt himself or anyone else, he did not need in-patient treatment, and he was not taking any medication to treat any mental health condition. Finally, although the author of the letter indicated Vlado might be impacted by " 'a language barrier or processing issue' " during court proceedings, she did not identify any mental health issue that would preclude Vlado from participating in or require a postponement of the trial.

Vlado cites two cases to support his contention that he was unable to attend the trial due to illness, neither of which is of assistance to him. First, in *Jaffe v. Lilienthal* (1894) 101 Cal. 175 (*Jaffe*), the court held that the trial court abused its discretion in denying a request for a trial continuance made on the day of trial by the plaintiff.[13] But there, the plaintiff submitted two affidavits—his own and his physician's—demonstrating that he suffered from "an attack of acute rheumatism … and was wholly unable to move or leave his room … and in the opinion of his physician would not be able to leave his room in less than two months." (*Id.* at p. 176.) Further, both the plaintiff and his attorney stated that the plaintiff's presence at trial was

---

[13] Like Rule 3.1332, the applicable law authorized a court to grant a continuance in the absence of a party for good cause. (*Jaffe, supra*, 101 Cal. at p. 178.)

"indispensably necessary." (*Ibid.*) Vlado produced no similar evidence here.

Vlado also cites *Betts Spring Co. v. Jardine Machinery Co.* (1914) 23 Cal.App. 705, in which a court's denial of a request for a continuance was reversed. There too, a party (the defendant) moved for a continuance on the basis of good cause due to an illness. That motion was supported by a declaration stating that "three months prior thereto the [defendant] had suffered a stroke of apoplexy, and shortly thereafter visited Europe, where he went on the advice of his physician in an endeavor to regain his health; that he was in Scotland at the present time, and it would be two months before he returned to San Francisco. The affidavit also averred that the [defendant] was the only witness to prove the matters and things set forth in his defense." (*Id.* at p. 706.) Notably, "there was no intimation that the motion was not made in good faith, nor was there any showing that the plaintiff would be injured or prejudiced by the delay." (*Id.* at pp. 706–707.) As already noted, Vlado produced no evidence that he had a disabling illness. And as for good faith, Vlado's conduct throughout the litigation reflects his pattern of delaying and obstructing the proceedings. The fact that Vlado's then-current counsel was Vlado's *twelfth* attorney of record in the dissolution matter also casts doubt on his tactics.

In short, Vlado failed to demonstrate good cause for a trial continuance due to unavailability based on an illness. Accordingly, the court did not abuse its discretion in denying his requests for a continuance of the trial on that basis.

24

2. **The court did not err in setting aside the stipulated property division and related order on equitable grounds.**

   **2.1. Legal Principles and Standard of Review**

   Vlado contends that, instead of dividing the community property equally, the court should have enforced the stipulated property division. (§ 2550.) "Property settlement agreements occupy a favored position in the law of this state[.]" (*Adams v. Adams* (1947) 29 Cal.2d 621, 624.) And generally speaking, courts are reluctant to disturb them "except for equitable considerations. A property settlement agreement, therefore, that is not tainted by fraud or compulsion or is not in violation of the confidential relationship of the parties is valid and binding on the court." (*Ibid.*; *In re Marriage of Woolsey* (2013) 220 Cal.App.4th 881, 897–898; *In re Marriage of Egedi* (2001) 88 Cal.App.4th 17, 22.)

   Nevertheless, settlement agreements such as the stipulated property division at issue are subject to attack on several grounds. "[A] trial court may set aside an MSA on traditional contract [grounds]. 'An MSA is governed by the legal principles applicable to contracts generally. [Citation.]' [Citations.]" (*In re Marriage of Egedi, supra*, 88 Cal.App.4th at p. 22.) As with all contracts, consent to agreements between spouses must be freely given, mutual, and communicated by one party to the other and such agreements are voidable and subject to rescission or set-aside by a party whose consent was obtained through duress, menace, fraud, undue influence or mistake. (See, e.g., *In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1523.)

   A court may also invalidate an agreement that is inequitable. "Family law cases 'are equitable proceedings in

which the court must have the ability to exercise discretion to achieve fairness and equity.' [Citation.] ' "Equity … will assert itself in those situations where right and justice would be defeated but for its intervention." [Citation.]' [Citation.] Thus, 'marital settlement agreements may be set aside where the court finds them inequitable even though not induced through fraud or compulsion. [Citations.]' [Citation.]" (*In re Marriage of Egedi, supra*, 88 Cal.App.4th at pp. 22–23.)

We review a court's ruling dividing property for abuse of discretion. (See *In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 309.)

### 2.2. Analysis

Ana sought to set aside the stipulated property division on multiple legal and equitable grounds including that she signed the agreement under duress, Vlado breached the agreement, she detrimentally relied on the agreement, the agreement is unconscionable due to the gross disparity in the distribution of community assets, and Vlado should be prohibited from attempting to enforce the agreement due to his unclean hands. The court agreed that the stipulated property division should not be enforced and found that Vlado failed to rebut the presumption of undue influence under section 721.

The court did not abuse its discretion in setting aside the stipulated property division and property division order as a matter of equity. First, and notwithstanding the provision[14] in

---

[14] The stipulated property division states, "The parties further acknowledge and agree that they enter into this agreement

the stipulated property division to the contrary, there is evidence that Ana signed the stipulation under duress which would nullify her consent to the agreement. (See *In re Marriage of Balcof, supra,* 141 Cal.App.4th at p. 1523 [noting duress " 'is shown where a party "intentionally used threats or pressure to induce action or nonaction to the other party's detriment" ' "]; see also *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 90 [such avowals might themselves be the product of undue influence].) Certainly, her trial testimony supports the point. Discussing the stipulated property agreement and agreement to sell the condo, Ana said she agreed to the deal because "I want to finish the whole saga with Mr. Valkov. I was on the edge. He was pushing me on the edge to fall in, in, in, in the face. I didn't have any other choices." Indeed, the very fact that the stipulated property division includes a provision requiring Vlado to sign a civil compromise, coupled with the grossly disproportionate division of property in Vlado's favor,[15] supports Ana's contention that she signed the stipulated property division because of the pending criminal prosecution. We agree with the court's characterization of these events: "Vlado misused the criminal court process to leverage a settlement from Ana." That Vlado sought to enforce

---

voluntarily, free from duress, fraud, undue influence, coercion or misrepresentation of any kind."

[15] Vlado received nearly all the community property (assets worth more than $300,000) in exchange for an equalization payment of $42,000 and his agreement to sign a civil compromise in the pending criminal case against Ana.

the stipulation even though he did not fully honor the deal[16] also supports the court's decision to set it aside.

Additional facts surrounding the stipulated property division also support the court's decision not to enforce it on equitable grounds. As noted, the stipulated property division was signed and negotiated at the same time as the agreement to sell the couple's condo. In accordance with the stipulation, Ana quitclaimed her interest in the condo to Vlado to facilitate the prompt sale of the property to Levitt. As part of the agreement to sell, Levitt agreed to pay Ana the $42,000 equalization payment Vlado owed her. But Vlado refused to sell the condo according to the agreement to sell and therefore Levitt did not make the full equalization payment to Ana. Thus, not only did Ana not receive the benefit of her bargain with Vlado and Levitt, but she was also forced to join Levitt to the case and seek court intervention to sell the condo—at a considerable cost both in terms of time and money.

Finally, we reject Vlado's assertion that the court could not set aside the stipulated property division because it was incorporated into the property division order. None of the authorities cited by Vlado holds that a court loses its inherent equitable authority to set aside a stipulated agreement when the agreement is incorporated into a court order. Further, even if

---

[16] Although Vlado apparently signed a civil compromise at one point, on August 10, 2017, Vlado's counsel wrote to the District Attorney's office stating Vlado's intent to withdraw any previous agreement to enter into a civil compromise. Counsel represented that the civil compromise was signed as part of a global settlement that did not come to fruition.

Vlado is correct that the presumption of undue influence did not apply and it was Ana's burden to demonstrate why the stipulated property division and related property division order should be set aside, she did so. (See *In re Marriage of Kieturakis*, *supra*, 138 Cal.App.4th at p. 90 [party seeking relief from a judgment that incorporates an unequal marital settlement agreement must bear the burden of proof where the judgment is at least six months old]; see also *Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287–1288 ["If substantial evidence supported the implied finding [made by the trial court], then the trial court's misallocation of the burden of proof would be harmless because there would be no reasonable probability the court's decision would have been different in absence of the error."].)

In sum, we see no error in the court's decision to exercise its equitable authority to set aside the stipulated property division as well as the order confirming that stipulation.

3.  **The court did not abuse its discretion in imposing sanctions against Vlado under section 271.**

    3.1. **Legal Principles and Standard of Review**

    Vlado contends the court abused its discretion in awarding Ana approximately $85,000 in attorney's fees as a sanction against him under section 271. Subdivision (a) of that section provides: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An

29

award of attorney's fees and costs pursuant to this section is in the nature of a sanction. In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award."

"Section 271 authorizes a fees and costs award as a penalty for obstreperous conduct." (*Robert J. v. Catherine D.* (2009) 171 Cal.App.4th 1500, 1520.) " 'The imposition of sanctions under section 271 is committed to the sound discretion of the trial court. The trial court's order will be upheld on appeal unless the reviewing court, "considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order." [Citation.]' [Citation.]" (*Sagonowsky v. Kekoa* (2016) 6 Cal.App.5th 1142, 1152.)

### 3.2. Analysis

The court's order awarding sanctions is predicated in part on the following relevant findings: "The facts are troubling. Vlado sought an unequal distribution of the community asset[s]. He initially obtained it by Ana's agreement (albeit under undue influence). But then Vlado lost his leverage because the criminal charges against Ana had been dropped with his consent in the interim. When he lost that leverage, he started to engage in other litigation tactics. Judge Leis found that he backdated [Ana's proposed MSA] to try to create a settlement where one did not

30

exist. And this Court finds that Vlado knowingly and wrongfully filed the [stipulated property division] when he knew or should have known that it was no longer enforceable or capable of performance. All of this against … a five-year [domestic violence restraining order], with Vlado recently engaging in an act that would itself be considered a lethality factor in domestic violence (self-harm) and Vlado having gone through 12 lawyers." As described in detail *ante*, these factual findings are supported by substantial evidence.[17]

Nevertheless, Vlado contends the court abused its discretion in awarding fees under section 271. For the most part, Vlado simply ignores the evidence and prior court findings against him. He argues, for example, that he tried to settle the case "via the April 18, and June 24, 2017, agreements, which Ana negotiated with benefit of counsel, and both she and her counsel signed. Ana, not Vlado, refused not only to settle, but sought to avoid her own negotiated settlements, first by opposing Vlado's section 664.6 motion and then by seeking to have the 2017 stipulation and resulting order set aside. This conduct is the opposite of the policy sought to be furthered by section 271." Of course, the court found that Vlado and Ana did not reach an agreement on June 24, 2017, and found further that Vlado

---

[17] Many of Vlado's bad-faith tactics took place while he acted as his own attorney. Vlado retained 12 different attorneys during the course of the proceedings below. One of Vlado's prior attorneys was relieved as counsel by the court after Vlado threatened to hurt the attorney's family. Another attorney advised Ana's counsel that he no longer wished to represent Vlado due to Vlado's " 'inability to control his anger and lash out to others [sic].' "

31

fraudulently backdated Ana's proposed MSA and then attempted to enforce it, necessitating a multi-day court trial. This is only one of many examples cited by the court in its order that support the award of sanctions in this case.

Vlado also contends the sanctions award is an unreasonable financial burden on him and points to evidence that his income was relatively low in the years preceding the trial. Income is not the only measure of ability to pay, however. As noted, in addition to awarding Vlado more than $300,000 in cash and community property assets, the judgment confirms as Vlado's separate property assets valued at approximately $95,000. Vlado does not explain why those assets cannot be used to pay the sanctions award and has therefore failed to establish an abuse of discretion on the part of the court.

## DISPOSITION

The judgment is affirmed. Respondent Ana Valkova shall recover her costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:


EDMON, P. J.


LIPNER, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.